Clay L. SHAW

v.

Jim GARRISON et al.

Civ. A. No. 70–466.

United States District Court,
E. D. Louisiana.

March 4, 1975.

F. Irvin Dymond, Edward F. Wegmann, William J. Wegmann, New Orleans, La., for plaintiff, Clay L. Shaw.

Jim Garrison, New Orleans, La., in pro. per.

Eberhard P. Deutsch, Malcolm W. Monroe, Deutsch, Kerrigan & Stiles, New Orleans, La., for defendant, Joseph M. Rault, Jr.

Peter J. Butler, Antonio E. Papale, Jr., Clem T. Sehrt, New Orleans, La., for defendant, Cecil M. Shilstone.

Eberhard P. Deutsch, Malcolm W. Monroe, Deutsch, Kerrigan & Stiles; Claude W. Duke, Duke & Porterie, New Orleans, La., for defendant, Willard E. Robertson.

James J. Gleason, III, New Orleans, La., for defendant, Perry Raymond Russo.

Richard C. Baldwin, Adams & Reese, Lawrence D. Wiedemann, Wiedemann & Fransen, New Orleans, La., for defendant, Dr. Esmond A. Fatter.

HEEBE, Chief Judge:

We write today yet another chapter in what is undoubtedly one of the most bizarre episodes in American political and legal history. The matter before the Court arises out of the well publicized investigation conducted by then District Attorney of Orleans Parish, Jim Garrison, concerning the assassination of President John F. Kennedy on November 22, 1963.

The instant case is a civil action for damages brought by plaintiff Clay L. Shaw against Garrison and others with whom he allegedly conspired to deprive plaintiff of his civil rights by prosecuting him in bad faith for conspiracy to assassinate President Kennedy and for perjury charges growing out of the original prosecution. The complaint was filed in February 1970 and alleges causes of action under the federal civil rights statutes, 42 U.S.C. §§ 1983,[1] 1985,[2] 1986.[3] The Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1343,

1. 42 U.S.C. § 1983:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. 42 U.S.C. § 1985 provides in pertinent part:
"(2) If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the

equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;
"(3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunites under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

3. 42 U.S.C. § 1986:
"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission

the jurisdictional counterpart of the civil rights statutes, and 28 U.S.C. § 1331.

In the more than five years from the date of filing of the complaint to the present, this case has yet to go to trial. Substantial discovery has been conducted and answers to interrogatories have been filed by plaintiff as well as four of the six defendants. Trial had been set for November 4, 1974.

On August 15, 1974, Clay Shaw died. He was survived by neither spouse, children, parents, nor siblings. On October 3, 1974, the Court granted the motion of Edward F. Wegmann, Executor of Shaw's last will, to be substituted as plaintiff in place of Shaw, pursuant to Rule 25(a) of the Federal Rules of Civil Procedure. Defendants Rault, Shilstone, Robertson, and Fatter have now brought two motions before the Court: (1) a motion to dismiss for abatement of the claim upon Shaw's death; and (2) a motion to dismiss the cause of action under 42 U.S.C. §§ 1985 and 1986 for failure to state a claim upon which relief can be granted.

All parties initially directed their arguments on the abatement issue solely to the proper disposition required under state law. The Court requested additional briefs, which the parties have filed, addressed to the question of whether this Court can, and should, apply a federal common law of survival in civil rights actions, and deferred decision on both motions pending receipt of those briefs. We conclude that the matter would abate under the state law of Louisiana. However, for reasons discussed below the Court finds that it is not bound by state law. After considering the purposes underlying the federal civil rights statutes, the development of the laws of survival and abatement in the federal courts and the fifty states, and the necessity in cases such as this to fully effectuate the broad remedial goals of these federal statutes, it is the conclusion of this Court that federal common law requires that this pending action survive in favor of the executor of decedent's last will. Finally, we agree with the defendants that the plaintiff has not stated a cause of action under 42 U.S.C. §§ 1985 and 1986, and we grant their motion to dismiss as to those claims.[4]

I. The Allegations of the Complaint

■ For purposes of determining a motion to dismiss, all the allegations of the complaint must be taken as true. These allegations are substantially the same as the facts found and set out at length in a related case, Shaw v. Garrison, 328 F.Supp. 390 (E.D.La.1971), aff'd 467 F.2d 113 (5th Cir. 1972), in which Judge Herbert W. Christenberry of this court permanently enjoined Garrison and his employees from further prosecuting Shaw in a then pending state criminal action for perjury. Although both questions before this Court are clearly framed legal issues dependent on only a few uncontested facts, we recite plaintiff's allegations in some detail here in order to give a full under-

---

of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued."

4. The motion to dismiss for failure to state a claim under 42 U.S.C. §§ 1985, 1986 brought by defendants Rault, Shilstone, Robertson, and Fatter has not been joined in by defendants Garrison and Russo. However, our finding that plaintiff's complaint does not state a cause of action under these statutes is applicable to the latter defendants as well.

standing of the background and present posture of the case.

The matter begins, tragically, with the assassination of President John F. Kennedy in Dallas, Texas, on November 22, 1963. Lee Harvey Oswald was arrested and charged with the crime, but he himself was killed shortly after his arrest. A blue-ribbon panel of distinguished individuals, headed by then Chief Justice of the United States Earl Warren, was appointed by President Lyndon B. Johnson "to ascertain, evaluate and report upon the facts relating to the assassination of the late President John F. Kennedy and the subsequent violent death of the man charged with the assassination." Executive Order No. 11130. The final report of the Warren Commission, consisting of 26 volumes of evidence, concluded that Lee Harvey Oswald was the sole person responsible for the death of President Kennedy. Specifically, the Commission found no evidence of any conspiracy to assassinate President Kennedy.[5]

Plaintiff alleges that during November 1966, defendants entered into a conspiracy among themselves and with others not named as defendants herein to misuse the legal machinery of the State of Louisiana by conducting a fraudulent investigation of the assassination solely for the personal and political aggrandizement of the conspirators, particularly Garrison, Robertson, Rault, and Shilstone. Defendants Robertson, Rault, and Shilstone are connected with the alleged conspiracy primarily through their formation of an organization known as "Truth and Consequences" in the latter part of February 1967, shortly before plaintiff's arrest. The organization was formed to provide financial support for Garrison in the conduct of his investigation. Plaintiff alleges that the three defendants named above were kept aware of the progress of Garrison's investigation and were continually consulted by him. A sum in excess of seventy thousand dollars was provided by the Truth and Consequences organization, substantially all of which was contributed between the dates of Shaw's arrest in March 1967 and his acquittal of the conspiracy charges in March 1969. Further, plaintiff alleges that defendant Robertson provided Garrison with thirty thousand dollars of cash funds for the investigation and further assisted Garrison by employing one of the state's major witnesses, a member of the Dallas police department, prior to and during the conspiracy trial. Portions of the money contributed by Truth and Consequences were used, plaintiff contends, for the procurement of perjured testimony.

Plaintiff was first interviewed by Garrison's staff on December 21, 1966, at the District Attorney's office. He was summoned to the District Attorney's office again on March 1, 1967, for further questioning. He was arrested later that day, and charged with having participated in a conspiracy to murder President John F. Kennedy. Members of the news media had been alerted to plaintiff's arrest, and when he was led from Garrison's office, the event was fully reported by the media. Shaw could have been taken from the District Attorney's office through a back exit, without having to pass before the gathered media. This was one of numerous incidents alleged by plaintiff which, he contends, proves that the major purpose of the investigation was publicity for the investigators, not prosecution of guilty persons.

The main witness against Shaw at the preliminary hearing was defendant Perry Raymond Russo. Russo testified that he had been present at a meeting at

5. The report stated in part:
"Because of the difficulty of proving negatives to a certainty, the possibility of others being involved with either Oswald or Ruby cannot be established categorically, but if there is any such evidence it has been beyond the reach of all the investigative agencies and resources of the United States and has not come to the attention of the Commission." Report of the President's Commission on the Assassination of President Kennedy, Conclusion 9 (1964).

which Shaw conspired with Lee Harvey Oswald and one David W. Ferrie [6] to assassinate President Kennedy. This testimony, again according to the allegations of plaintiff in his complaint, was procured by the use of hallucinatory drugs and hypnosis administered by Dr. Esmond A. Fatter, defendant herein, and the late Dr. Nicholas Chetta, Coroner of Orleans Parish, acting under instructions from Garrison. Dr. Fatter placed Russo in an hypnotic trance on at least two occasions during which the hypnotic suggestions were made.

In June of 1967, Lieutenant O'Donnell of the New Orleans Police Department and the Department's polygrapher, acting on instructions from Garrison, attempted to give Russo a lie detector test. The test was not successful. However, during an interview later that day, Russo told O'Donnell that he could not identify Shaw as having been present at the alleged conspiratorial meeting. Garrison was given a written report of this interview with Russo, but never made the report available to plaintiff's counsel.

Trial in the matter began on January 21, 1969, and ended March 1, 1969. At the trial, Russo was unable to identify Shaw as one of the alleged conspirators whom he had previously testified he had heard plotting the assassination of President Kennedy. Plaintiff alleges that because of the O'Donnell report and for other reasons Garrison knew at the time of trial that Russo could not so identify Shaw. He further alleges that the other witnesses who testified against Shaw were equally lacking in credibility and that that fact was known to Garrison.

The trial lasted forty days. At the conclusion of the trial, the jury took only fifty-five minutes to return a unanimous verdict of not guilty.

On Monday, March 3, 1969, the first working day thereafter, Garrison prepared and signed a bill of information charging the plaintiff with two counts of perjury. The basis of the perjury charge was Shaw's testimony at trial that he had never seen nor been acquainted with David W. Ferrie or Lee Harvey Oswald. No other witnesses testifying at Shaw's trial were charged with perjury.

As noted above, Judge Christenberry permanently enjoined defendant Garrison, his agents and employees, from further prosecution of the state perjury charge against Shaw. The basis for the court's injunction was a finding that the two prosecutions of Shaw by Garrison were conducted in bad faith. The court determined that the totality of the circumstances made the case fall within the narrow exception to the general rule announced in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), that the federal courts should not interfere with pending state criminal prosecutions except for the most compelling of reasons. Shaw v. Garrison, 328 F. Supp. 390 (E.D.La.1971), aff'd 467 F.2d 113 (5th Cir. 1972).

## II.  Non-abatement of the Action

### A.  Deficiency of the Federal Law

Our analysis begins with a consideration of 42 U.S.C. § 1988:

"The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; *but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State* wherein the court having jurisdiction of such civil or criminal cause is held, *so far as the same is not inconsistent with the Con-*

---

6. Ferrie did not testify at the preliminary hearing because he died on February 20, 1967, just prior to plaintiff's arrest.

*stitution and laws of the United States, shall* be extended to and *govern the said courts* in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty." (emphasis added)

■ There is no general federal statutory law of survival governing civil rights actions.[7] The initial question for decision then is whether this lack of survival makes the federal law "deficient in the provisions necessary to furnish suitable remedies."

■ A brief consideration of the legislative history behind 42 U.S.C. §§ 1983, 1985 makes clear that its supporters intended that the predecessor of these statutes be construed as broadly as necessary to remedy evils in response to which it was passed. The legislative history is more fully set out in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961). We refer to only a small portion of that extensive debate.

Sections 1983 and 1985 were originally enacted as §§ 1, 2 of the Ku Klux Act of April 20, 1871. The act was passed out of a concern over the widespread lawless activities of the Ku Klux Klan in the South at that time. These activities included not only the intimidation of citizens, but physical violence including murder.[8]

In introducing the bill, Representative Shellabarger, Chairman of the House Select Committee which drafted the Ku Klux Act, stated:

"This act is remedial, and in aid of the preservation of human liberty and human rights. All statutes and constitutional provisions authorizing such statutes are liberally and beneficially construed. . . . [T]he largest latitude consistent with the words employed is uniformly given in construing such statutes and constitutional provisions as are meant to protect and defend and give remedies for their wrongs to all the people."[9]

Later in the debate, Representative Shellabarger stated:

"It will be remembered that the second section [now § 1985] gives a civil right of action for injury to person or property, &c; but it gives no right of action where death occurs. I think that is a defect in the second section."[10]

Senator Osborn of Florida commented upon the proper scope of the law:

"That the State courts in the several States have been unable to enforce the criminal laws of their respective States or to suppress the disorders existing, and in fact that the preservation of life and property in many sections of the country is beyond the power of the State government, is a sufficient reason why Congress should, so far as they have authority under the Constitution, enact the laws necessary for the protection of citizens of the United States."[11]

Although the bill did not, by its terms, delineate a comprehensive system of remedies, it was not the intention of Congress to deny those remedies to civil rights plaintiffs. Born out of the violence of the Ku Klux Klan activities, the civil rights bill passed by Congress had as its object the effective protection of the rights of all persons. Whatever remedies would give substance to these rights were to be applied.

The courts, in considering the legislative history, have concluded that the failure to provide for survival in the

---

7. The provisions of 42 U.S.C. § 1986 allow limited damages for the death of any party caused by failure to prevent certain acts actionable under § 1985. See n. 3, *supra.*

8. *See, e.g.,* the remarks of Representative Lowe of Kansas, Cong. Globe, 42d Cong. 1st Sess., App. 166–167, and Representative Beatty of Ohio, *id.* at 374, *quoted in* Monroe v. Pape, *supra* at 175, 81 S.Ct. 473. *See*

*also* the message sent to Congress by President Grant, Cong. Globe, 42d Cong., 1st Sess., p. 244.

9. Cong. Globe, 42d Cong., 1st Sess., App. p. 68.

10. *Id.,* p. 805.

11. *Id.,* p. 653, *quoted in* Monroe v. Pape, *supra* at 176, 81 S.Ct. at 478.

federal civil rights laws is a deficiency in those provisions. The most thorough discussion of the matter is contained in the opinion of the Court of Appeals for the Fifth Circuit in Brazier v. Cherry, 293 F.2d 401 (5th Cir. 1961). That case involved a suit filed under the federal civil rights laws, 42 U.S.C. § 1981 et seq., by the surviving widow, individually and as administratrix of decedent's estate, against various Georgia police officers, for the allegedly illegal arrest and beating of decedent, which resulted in his death. No suit had been instituted prior to the death of decedent. The Court of Appeals held that since federal law was deficient for failure to provide for survival, Georgia state law, which provided for both survival of the decedent's cause of action and for a wrongful death action, was to be applied in the federal suit to allow the maintenance of those actions.

The Court of Appeals first rejected defendants' contention that the civil rights statutes, by their language, reflect a purpose that actions under that statute shall not survive. Since § 1983 provides that the violator "shall be liable to the *party injured*" (emphasis added) and § 1985(3) affords a right of action to the "party so injured or deprived," the claim was made that Congress purposefully extended the right to file a civil suit for damages only to the person whose civil rights were violated. In rejecting this contention, the court found a "clear congressional policy to protect the life of the living from the hazard of death caused by unconstitutional deprivations of civil rights . . . ." Brazier v. Cherry, *supra* at 405. It went

on to state the purposes of the civil rights statutes concerning survival:

"[I]t defies history to conclude that Congress purposely meant to assure to the living freedom from such unconstitutional deprivations, but that, with like precision, it means to withdraw the protection of civil rights statutes against the peril of death. The policy of the law and the legislative aim was certainly to protect the security of life and limb as well as property against these actions. Violent injury that would kill was not less prohibited than violence which would cripple." (footnote omitted) *Id.* at 404.[12]

The *Brazier* court concluded that "[o]n our analysis federal law is not suitable, i. e., sufficient, since it leaves a gap for death in a substantive policy making no distinction between violent injury and violent death." *Id.* at 408.

■ Every court that has considered the matter has found, either explicitly or by implication, that the lack of survival provisions in the federal civil rights laws is such a deficiency. *E. g.*, Brazier v. Cherry, *supra;* Pritchard v. Smith, 289 F.2d 153 (8th Cir. 1961); Evain v. Conlisk, 364 F.Supp. 1188 (N.D.Ill. 1973), aff'd without opinion 498 F.2d 1403 (7th Cir. 1974); Holmes v. Silver Cross Hospital of Joliet, Illinois, 340 F. Supp. 125 (N.D.Ill.1972); Ambrose v. Wheatley, 321 F.Supp. 1220 (D.Del. 1971); Johnson v. Wilkinson, 315 F. Supp. 773 (W.D.Mo.1970); Salazar v. Dowd, 256 F.Supp. 220 (D.Colo.1966); Galindo v. Brownell, 255 F.Supp. 930 (S.D.Cal.1966). This finding is a prerequisite to the application of state law, for only where the federal laws are deficient may a court look elsewhere to rem-

---

12. The death involved in *Brazier* allegedly was a direct result of the actions of the defendants. In the present case it is not alleged nor has the substituted plaintiff asserted that Clay Shaw's death occurred from causes related to the actions of the defendants herein. We find that this distinction does not warrant any different result from that in *Brazier*. None of the state statutes which provide for survival of causes of ac-

tion make any distinction between deaths caused by defendants and those which are not. *See* statutes compiled at n. 18, *infra*. The same is true of several federal statutes, *e. g.*, the Federal Employers' Liability Act, 45 U.S.C. § 59, and the Jones Act, 46 U.S.C. § 688, incorporating the provisions of the FELA by reference. *But see* the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 909.

edy the deficiency. Thus, even those courts which have concluded after considering the applicable state law that such law does not provide for survival of a particular action, *e. g.,* Evain v. Conlisk, *supra,* must necessarily have first found federal law to be deficient in not providing for survival.

Having concluded that a deficiency exists, we look first to the state law of Louisiana to furnish a suitable remedy.

## B. State Law

We are called upon to determine whether Louisiana law provides that a pending action for damages for violation of plaintiff's civil rights survives the death of the plaintiff in favor of the administrator of his estate. We emphasize at the outset that we are not concerned with wrongful death actions for damages to others caused by the tort victim's death. Also to be distinguished are survival of causes of action, where the tort victim dies without bringing suit, and the question is whether a party may *institute* suit to recover for the tort victim's own damages. In the case at bar, Clay Shaw had already brought suit against the defendants more than four years prior to his death. The question before us is technically one of abatement *vel non* of a pending action.

Article 428 of the Louisiana Code of Civil Procedure (C.C.P.) provides:

> "An action does not abate on the death of a party. The only exception to this rule is an action to enforce a right or obligation which is strictly personal."

■ If this were the only relevant provision, then the decision would be easy. It would turn simply on whether this civil rights action is an action to enforce a right or obligation which is strictly personal. However, two other provisions of the Louisiana codes complicate the matter considerably. Article 2315 of the Louisiana Civil Code [13] and Article 801 of the Code of Civil Procedure [14] define the proper beneficiaries to inherit the action and both articles contemplate separate requirements for survival depending on the nature of the damages suffered: if the suit is one for damages to property, substitution by the succession representative is proper; if the suit is one for any other kind of damages, only the certain named classes of beneficiaries may be substituted.

13. Louisiana Civil Code art. 2315:
   "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
   "The right to recover damages to property caused by an offense or quasi offense is a property right which, on the death of the obligee, is inherited by his legal, instituted, or irregular heirs, subject to the community rights of the surviving spouse.
   "The right to recover all other damages caused by an offense or quasi offense, if the injured person dies, shall survive for a period of one year from the death of the deceased in favor of: (1) the surviving spouse and child or children of the deceased, or either such spouse or such child or children; (2) the surviving father and mother of the deceased, or either of them, if he left no spouse or child surviving; and (3) the surviving brothers and sisters of the deceased, or any of them, if he left no spouse, child, or parent surviving. The survivors in whose favor this right of action survives may also recover the damages which they sustained through the wrongful death of the deceased. A right to recover damages under the provi-

sions of this paragraph is a property right which, on the death of the survivor in whose favor the right of action survived, is inherited by his legal, instituted, or irregular heirs, whether suit has been instituted thereon by the survivor or not.
   "As used in this article, the words 'child', 'brother', 'sister', 'father', and 'mother' include a child, brother, sister, father, and mother, by adoption, respectively."

14. C.C.P. art. 801:
   "When a party dies during the pendency of an action which is not extinguished by his death, his legal successor may have himself substituted for the deceased party, on ex parte written motion supported by proof of his quality.
   "As used in Articles 801 through 804, 'legal successor' means:
   "(1) The survivors designated in Article 2315 of the Civil Code, if the action survives in their favor; and
   (2) Otherwise, it means the succession representative . . . or the heirs and legatees of the deceased."

Seeking to avoid the strictures of the latter, Shaw's executor contends that his suit is, at least in part, one to recover damages to property. He asserts that Shaw's estate was deprived of income which Shaw could have earned had he not been preoccupied with defending the criminal charges against him; that he had to pay attorneys' fees and investigative expenses; that he could not attend to his real property because of the demands on his time, and its value thus lessened; and in sum that, "it is his estate, which his testamentary executor represents, that suffered great property damage." (Plaintiff's brief, p. 7).

These assertions hardly need be taken seriously. They amount to no more than the incidental hardships common to any litigation. If these damages allegedly suffered represent damages to property, then any suit filed may be twisted in the same way to fit within this pigeonhole. The crux of this civil rights action is for damages arising out of personal injuries. It bears not the slightest resemblance to a suit which seeks to recover damages to real or personal property.

The more serious question is whether the provisions of Article 2315 limiting survival to only named classes of beneficiaries in cases of non-property damage apply to pending actions as well as actions not yet instituted. The leading case on the subject is J. Wilton Jones Co. v. Liberty Mutual Ins. Co., 248 So.2d 878 (La.App.1971), writ den., 259 La. 61, 249 So.2d 202 (1971), decided by a divided court on rehearing en banc.

The case involved a suit for damages for personal injuries sustained in an automobile accident. One of the two original plaintiffs died some eighteen months after suit had been filed, but prior to trial. Within one year's time from plaintiff's death, his widow filed a petition as "administratrix of decedent's succession" claiming that, as administratrix, she was entitled to be substituted in the action, and she prayed for judgment in favor of the estate. Subsequently, more than one year after her husband's death, she filed a second petition seeking both survival and wrongful death benefits in her own behalf.[15] The time periods involved are important because Art. 2315 provides that the right to recover in favor of the named classes of beneficiaries survives only for a period of one year from the death of the deceased. If the time restrictions applied to instituted actions and the administratrix was not a proper party to sue, the widow would not recover because her substitution in the action as widow occurred after the one-year period had run.

Faced with this problem, the court found a "radical difference" between an action not yet instituted and the substitution of parties in an instituted action. Id. 248 So.2d at 891. The court held that only an action not yet instituted is subject to the time requirements of Art. 2315. Once an action has been instituted either by the victim or by survivors and it does not abate under Art. 428, the timeliness of substitution is governed only by the five-year inaction abandonment rule of C.C.P. art. 561.[16] Thus, in the Jones case, substitution was timely and the action survived.

One might reasonably expect that this distinction between instituted actions. and not-yet-instituted causes of action would be applied in determining the proper parties for substitution, as well as the timeliness of substitution. But that is not the holding of Jones.

After reviewing the statutory history of Article 2315 and related provisions, the court concluded, at 891:

"As long as art. 2315 spoke of the right of this action' surviving in favor of designated beneficiaries, it might have been concluded that an *instituted*

---

15. The wrongful death claim was subsequently withdrawn.

16. Article 561 states in pertinent part:
"An action is abandoned when the parties fail to take any steps in its prosecution or defense in the trial court for a period of five years."

*action* was not governed by a provision dealing with a right of action (or right *to institute the action*). See Gabriel v. United Theatres, La.App. 1951, 50 So.2d 514 (reversed, 221 La. 219, 59 So.2d 127).

"Today art. 2315 provides, instead, that the 'right to recover' survives in favor of the designated beneficiaries.

"In our opinion the present language provides (at least if designated beneficiaries do survive) for the devolution of the victim's claim, even where he has instituted an action, to the survivors designated by art. 2315. The 'right to recover' belongs to them, and not to the succession of the victim nor to his heirs as such." (emphasis in original)

The emphasis which the court gives to this statutory change is somewhat questionable, since the statute still twice refers to the "right of action" in addition to its references to the "right to recover." The original panel decision took note of this fact and reasoned that since "right of action" does not refer to instituted actions, Art. 2315 in its entirety governs only the survival of causes of action where suit had not been filed prior to decedent's death. Where suit had already been filed, the inheritance of the action is governed by the provisions of C.C.P. arts. 421 and 426, and the succession articles of the Civil Code. Thus, the panel concluded, the restrictions concerning in whose favor the right to recover survives do not apply to an already instituted action.

The *en banc* court clearly rejected this line of argument, although without fully enunciating their reasons for doing so. The only member of the *en banc* court still adhering to the panel's initial opinion was Judge LeSueur, the author of that opinion. The prevailing opinion of the *en banc* court rejected the panel's conclusion as did the other concurring judge. Moreover, the four remaining judges, while dissenting from the result of the majority concerning timeliness of the widow's substitution, each held that the right to recover damages for injuries to a deceased plaintiff is limited to the Art. 2315 beneficiaries, whether suit had been instituted prior to decedent's death or not.

The case was cited with apparent approval by the Louisiana Supreme Court in Austrum v. City of Baton Rouge, 282 So.2d 434, 439 (La.1973). *See also* McBeth v. United Press International, Inc., 505 F.2d 959 (5th Cir., 1974).

■■ We have discussed the reasoning of the court in Jones v. Liberty Mutual Ins. Co., *supra*, in some detail only to show that the question of the applicability of Art. 2315 to instituted actions was squarely considered and decided by the state appellate court. Whether the failure of that court to draw a distinction between pending actions and causes of action not yet instituted for purposes of substitution of parties is sound is of no concern to this Court. Although we are determining state law pursuant to 42 U.S.C. § 1988 and not sitting as an *Erie* court, the teaching of Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), applies equally well here. In interpreting state law, we are bound by the construction put on it by the state courts, whether we agree with the reasoning upon which that construction is based or not. *See* Delta Air Lines v. McDonnell Douglas Corp., 503 F.2d 239 (5th Cir., 1974). An analysis of Jones v. Liberty Mutual Ins. Co., *supra*, makes clear that under state law pending actions for non-property damages do not survive in favor of decedent's personal representative. With that, our responsibility for determining state law ends.

C. Inconsistency of State Law with Federal Law

■ Under § 1988, a federal court must not apply state law if it is "inconsistent with the Constitution and laws of the United States." Surely, if Louisiana law did not provide for survival of any tort actions, this Court would have no difficulty in holding that the state law was inconsistent with § 1983 because the state law directly contravened the policy

of the civil rights laws, which, as discussed above, favors survival. However, in actions such as this for other than property damage, Louisiana law allows survival in favor of certain classes of close relatives; it does not provide for survival of this particular action because Clay Shaw was not survived by any member of these classes. We find this policy of limiting the classes of persons in favor of whom an action survives equally inconsistent with the federal civil rights laws.

We distinguish at the outset the creation of actions for wrongful death. These are actions for damages suffered by the beneficiary for loss of love and affection of the deceased. As such, they logically must be limited to certain close relatives of the deceased. Thus, under the Federal Employers' Liability Act, 45 U.S.C. § 51, and the Jones Act, 46 U.S.C. § 688, which incorporates the former provisions by reference, wrongful death actions are created for the benefit of the surviving widow and children, parents and next of kin dependent on the employee; under the Death on the High Seas Act, 46 U.S.C. § 761, for the benefit of the decedent's wife, husband, parent, child, or dependent relative; and under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., "death benefits" in favor of surviving widow, child, and dependent grandchildren, siblings and certain other dependent persons. State statutes follow a similar pattern. *See also* Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

Where the question is one of survival, however, there is no corresponding need to limit the classes of beneficiaries because the measure of damages are those suffered by the deceased. This is the position taken by all of the 49 other states. While the state laws differ as to what types of causes of action survive,[17] they are unanimous in providing that those actions which do not abate survive in favor of and against the personal representatives of the deceased.[18]

---

17. Some of the state statutes provide for survival of all causes of action, *e.g.*, Ark. Stat.Ann. § 27–901 (repl.ed.1962), Fla.Stat. Ann. § 46.021 (1969), Burns' Ind.Ann.Stat. § 2–403 (repl.ed.1967), Mich.Ann.Stat. § 27A.2921 (rev.1962), M.C.L.A. § 600.2921; others omit certain types of cases—*e.g.*, causes of action for libel, slander, or malicious prosecution—from a general rule favoring survival, *e.g.*, Ariz.Rev.Stat.Ann. § 14–3110 (Spec. Pamphlet 1974); Colo.Rev. Stat.Ann. § 153–1–9 (1963); Del.Code Ann. tit. 10 § 3701 (1953); Ohio Rev.Code Ann. § 2311:21 (Baldwin 1971).

It is true that if this action had been brought as one for malicious prosecution in a state court in a state which had the latter type of statute, the action would abate. We do not find it necessary to catalogue the number of states with such a statute because we believe that the underlying nature of a civil rights action if brought in a state court is not relevant for purposes of determining a federal common law of survival. The fact of the matter is that this is not a state action for libel, slander, or malicious prosecution, but a federal action for violation of plaintiff's civil rights. We have already determined that the purposes underlying this statute require that the action not abate, if there is some proper mechanism for survival. The fact that some states may have a different policy for a cause of action based on the same facts yet differently characterized should not be binding on a federal court construing civil rights actions.

18. Ala.Code Ann. tit. 7, § 150 (1960); Alas. Stat.Ann. § 09.55.570 (1962); Ariz.Rev. Stat.Ann. § 14–3110 (Spec. Pamphlet 1974); Ark.Stat.Ann. § 27–901 (repl.ed.1962); Probate Code of California § 573; Colo.Rev. Stat.Ann. § 153–1–9 (1963); Conn.Gen. Stat.Ann. § 52–599 (1958); Del.Code Ann. tit. 10, § 3701 (1953); Fla.Stat.Ann. § 46.-021 (1969); Ga.Code Ann. § 3–505 (rev. 1962); Hawaii Rev.Stat. § 634–84 (1968); Idaho Code Ann. § 5–327 (Supp.1974); Ill. Ann.Stat. ch. 3, § 339 (Smith-Hurd 1961), ch. 110, § 54 (Smith-Hurd 1968); Burns' Ind.Ann.Stat. § 2–403 (repl. ed. 1967); Iowa Code Ann. §§ 611.20, 611.22 (1950); Kan. Stat.Ann. §§ 60–225 (Supp.1974), 60–1801 to 60–1802 (1967); Ky.Rev.Stat.Ann. § 411.140 (1969); Me.Rev.Stat.Ann. tit. 18, § 2501 (Supp.1974); Md.Ann.Code CJ § 6–401 (1974); Mass.Ann.Laws ch. 228, §§ 1, 4 (1974); Mich.Stat.Ann. §§ 27A.2921, 27A.-5852 (rev.1962), M.C.L.A. §§ 600.2921, 600.-5852; Minn.Stat.Ann. §§ 525.43 (1969), 573.01–573.02 (Supp.1974); Miss.Code Ann. § 91–7–233 (1972); Mo.Ann.Stat. §§ 537.020 (Supp.1974), 537.030 (1953); Mont.Rev. Code Ann. § 93–2824 (repl.ed.1964); Neb.

The need to provide for survival of federal civil rights actions is particularly acute in cases, such as the one before the Court, in which plaintiff seeks redress for injuries to his character. Because of defendant Garrison's alleged misuse of his office, Shaw was forced to defend himself for a period of almost five years against a charge that he conspired to assassinate the President of the United States. It may be that, at trial, plaintiff will not be able to carry his burden of proving the facts to support his allegations. However, Shaw surely deserves an opportunity to have his day in court and attempt to clear his name, if only posthumously. Since Louisiana law would deny him this opportunity, we hold that it is inconsistent with federal law and should not be applied.

### D. Federal Common Law

█ The results reached so far leave the Court with a dilemma: on the one hand, we have determined that the federal civil rights laws are deficient in their remedies because they make no provision for survival of causes of action; on the other hand, the applicable survival law of Louisiana, the only law which this Court is directed to apply pursuant to 42 U.S.C. § 1988, does not fully compensate for that deficiency. We must thus further consider whether this pending action survives in favor of decedent's personal representative as a matter of federal common law. The question is one of first impression in this Circuit.

Defendants claim that the court has no power to create such a federal common law: § 1988 directs the court to apply federal statutory law and if it is deficient, the court must apply state law currently in effect, if not inconsistent with the federal law. Since neither law provides for survival of the action in this instance, and since it is clear that at old common law any action for personal injury does not survive the death of the injured party, they contend that the action must abate. This contention is not without some support in the case law and in the language of § 1988 itself. However, after a careful consideration of the matter, the Court concludes that this result was not intended by Congress, is not commanded by the holding of any case binding on us, and, most importantly, is contrary to the broad remedial purposes underlying the federal civil rights laws.

Defendants point to language in Brazier v. Cherry, *supra*, which, they contend, indicates that state law exclusively is to be used in determining survival. The Court of Appeals stated:

"Since the federal statutory framework is, in the words of the statute, 'deficient in the provisions necessary to furnish suitable remedies and punish offenses against' that law and policy, the state law is to be used to the extent that it is currently available to overcome these deficiencies." *Id.* 293 F.2d at 408.

Moreover, in summarizing the "simple, direct, abbreviated test" set out in § 1988, the Fifth Circuit stated that the court first looks to "(a) federal law and if it is found wanting the court must

Rev.Stat.Ann. §§ 25–1401, 25–1402, 25–1410 (reissue 1964); Nev.Rev.Stat. § 41.100 (1965); N.H.Rev.Stat.Ann. § 556:9–556:15 (1955); N.J.Stat.Ann. §§ 2A:15–3 (Supp. 1974), 2A:15–4 (1952); N.M.Stat.Ann. §§ 21–7–4, 21–7–10 (repl.ed.1970); N.Y.E.P.T. L. § 11–3.2 (McKinney Consol.Laws, c. 17–b, 1967); N.C.Gen'l Stat.Ann. §§ 28–172, 28–175 (repl.ed.1966); N.D.Cent. Code Ann. § 28–01–26.1, R.Civ.P. 25(A) (repl.ed.1974); Ohio Rev. Code Ann. § 2311.21 (Baldwin 1971), R.Civ.P. 25(A) (Baldwin repl.1972); Okla.Stat.Ann. tit. 12, §§ 1052, 1082 (Supp. 1974); Ore.Rev.Stat. § 30.075 (1971); Pa.

Stat.Ann. tit. 20, §§ 3371, 3373 (Spec. Pamphlet 1972); R.I.Gen'l Laws Ann. §§ 9–1–6, 9–1–7 (reenactment 1969); S.C.Code Ann. §§ 10–209, 10–217 (1962); S.D.Code § 33.0414–1 (Supp.1960); Tenn.Code Ann. §§ 20–602, 20–605 (1955); Utah Code Ann. § 78–11–12 (Supp.1973); Vt.Stat.Ann. tit. 14, §§ 1451–1452 (repl.ed.1974); Va.Code Ann. §§ 8–146 (repl.ed.1958), 8–628.1, Rule 2:16 (Supp.1974); W.Va.Code Ann. § 55–7–8a (1966); Wisc.Stat.Ann. §§ 269.13 (1957), 287.01 (Supp.1974), 895.01 (1966); Wyo. Stat.Ann. §§ 1–26 to 1–28 (1957).

look to (b) state law currently in effect." *Id.* at 409.

We do not find such language dispositive of the question before us. It is undeniable that federal courts are directed by § 1988 to look to state law to provide relief where the federal statute is deficient. But § 1988 nowhere states that the federal court is bound by an inhospitable state law. If anything, the opinion in Brazier v. Cherry, *supra*, supports the opposite conclusion. The entire thrust of the court's opinion is toward finding a means to provide effective remedies. The court states:

> "From a federal standpoint *the only limitation upon the use of such adoptive state legislation, rule or decision is that it is suitable to carry the [federal] law into effect* because other available direct federal legislation is not adapted to that object or is deficient in furnishing a fully effective redress. Thus § 1988 declares a simple, direct, abbreviated test: what is needed in the particular case under scrutiny to make the civil rights statutes fully effective?" *Id.* (emphasis added)

Here, we have found § 1988 to be inapplicable because the state law is not "suitable to carry the [federal] law into effect." Under the terms of the statute, the state law is "inconsistent with . . . the laws of the United States" because such law does not provide for survival necessitated by the policies behind the civil rights statutes, and thus need not be applied.

The Seventh Circuit, in commenting upon Brazier v. Cherry, *supra*, noted that the result allowing survival of the cause of action had a firm basis in federal law and policy quite apart from any reference to § 1988. The Court of Appeals pointed out that "[w]hile many of the comments contained in these cases concerning the nature of Section 1988 are well considered, the decisions do not necessarily depend upon that statute." Baker v. F & F Investment, 420 F.2d 1191, 1196 n. 7 (7th Cir. 1970).[19]

Moreover, at least one other federal court in a civil rights action has applied a remedial rule directly contrary to the state law in effect, where no federal statute was applicable. In Basista v. Weir, 340 F.2d 74 (3rd Cir. 1965), the state law of Pennsylvania provided that punitive damages are not recoverable absent a showing of actual damages. The Court of Appeals found that it was not bound by the state law and held that as a matter of federal common law, it is not necessary to prove actual damages in order to recover punitive damages.

The decision of the district court in Evain v. Conlisk, *supra*, relied on by defendants, provides scant support for their position. In *Evain*, the court noted that Illinois law allows survival of a cause of action only in favor of decedent's estate, and thus held that a daughter was prohibited from bringing a civil rights action for the death of her father. That is the precise opposite of the situation here. Where the state statute was in conformity with those of the other states and suit could have been brought by the personal representative of decedent's estate, there was no reason for the federal court to look beyond the state statute.

In the context of the federal civil rights laws, courts have been mindful of the need to produce effective remedies, despite their apparent unavailability under federal statutes. In Sullivan v. Little Hunting Park, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), a suit was

---

19. Baker v. F & F Investment, *supra*, held that state statutes of limitation apply to federal civil rights actions. This in no way undercuts our decision today for there is a significant distinction between statutes of limitation and those restricting survival of causes of action. Statutes of limitation merely regulate the permissible time for filing suit: so long as the applicable period is clear, a plaintiff can assure himself of filing a timely action. However, statutes regulating survival may, as the Louisiana statute would here, entirely bar plaintiffs from ever filing suit. Thus, the hardship worked by the latter type of statute is much more severe.

brought under 42 U.S.C. § 1982 for injunctive relief and monetary damages, by a homeowner who was expelled from a neighborhood recreational corporation because he rented a house in the neighborhood to a black family. The language of § 1982 is declaratory only, and provides for no damages. The Supreme Court held that plaintiff was entitled to compensatory damages under § 1982, finding that "the existence of a statutory right implies the existence of all necessary and appropriate remedies." *Id.* at 239, 90 S.Ct. at 405.

A similarly broad interpretation of the remedies available under a federal cause of action was announced in Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L. Ed. 939 (1946). Holding that the district court has jurisdiction over a complaint seeking damages for violation of plaintiff's Fourth and Fifth Amendment rights, the Supreme Court stated:

> "[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Id.* at 684, 66 S.Ct. at 777 (footnotes omitted)

Furthermore, although the old common law provided that all actions abate upon the death of the parties, the unmistakable and inexorable trend in the law is toward creation of progressively greater rights of survival, both by statute and by judicial decision. As the Fifth Circuit noted in Brazier v. Cherry, *supra*, 293 F.2d at 406: "[a]t every turn the Supreme Court, by drawing on available state legislation or giving broad liberal effect to federal statutes has found a way to make compensation effective despite statutory language which might have made non-survival plausible, if not probable, during an earlier era." Much of this development has

occurred in federal maritime and admiralty law.

In Just v. Chambers, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941), the Supreme Court held that a cause of action in admiralty for damages survived the death of the tortfeasor. Although no federal statute provided for survival, and no equivalent of § 1988 existed for admiralty claims, the court held that an admiralty court could call upon the local state law which allowed for survival, at least where the injury in question occurred on navigable waters within the limits of the state. The court rejected the contention that only a federal statute could change the rule of admiralty law that causes of action for personal injury die with the person.

In Cox v. Roth, 348 U.S. 207, 75 S.Ct. 242, 99 L.Ed. 260 (1955), the issue was the survival of a cause of action under the Jones Act, 46 U.S.C. § 688, upon the death of the tortfeasor. As noted above, the Jones Act, in causes of action for death of a seaman, incorporated the provisions of the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq. The court broadly construed the provisions of the latter act to allow survival of the cause of action, despite its recognition that a "literal application of the words of the F.E.L.A. would result in the denial of recovery against the personal representative of the tortfeasor." *Id.* at 209, 75 S.Ct. at 243. To do otherwise would "frustrate the congressional purpose" underlying the Jones Act. *Id.*

Defendants correctly point out that these two cases, while expanding the bases for survival, merely applied some statutory law already enacted. However, their contention that a federal court may allow survival of an action only where a state statute so provides is seriously undercut by two other decisions of the Supreme Court, Van Beeck v. Sabine Towing Co., 300 U.S. 342, 57 S.Ct. 452, 81 L.Ed. 685 (1937), and Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

In Van Beeck v. Sabine Towing Co., *supra*, the Supreme Court held that a wrongful death action filed by a seaman's mother, pursuant to the Jones Act, 46 U.S.C. § 688, does not abate with the death of the mother but passes to her estate. The Jones Act, by incorporating the provisions of the Federal Employer's Liability Act for railway employees, 45 U.S.C. § 51, provided a cause of action for wrongful death for the benefit of certain specified kin. However, the Act did not specify any survival of the action upon the death of the beneficiary. The court held that the wrongful death action survived, after considering treatment of similar questions by the several states and lower federal courts.

Most damaging to defendants' argument is the Supreme Court's unanimous decision in Moragne v. States Marine Lines, *supra*.[20] Plaintiff sought to bring a wrongful death action based on unseaworthiness against the owner of a vessel upon which her husband worked. At the time of his death, the vessel was within the navigable waters of the State of Florida. Neither federal statute nor Florida state law provided for a wrongful death action based on the unseaworthiness of a vessel. Moreover, in The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886), the court had previously held that maritime law does not afford a cause of action for wrongful death. The Supreme Court overruled *The Harrisburg* and held that an action does lie under general maritime law for death caused by violation of maritime duties.

While *Moragne* concerns wrongful death actions and the case before us relates to the entirely distinct concept of survival of decedent's actions, *Moragne* stands for the proposition that creation of such remedies is not limited to statutory law. In determining whether to create wrongful death actions under the general maritime law, the court took

note of the proliferation of wrongful death statutes under federal and state law:

"This legislative establishment of policy carries significance beyond the particular scope of each of the statutes involved. The policy thus established has become itself a part of our law, to be given its appropriate weight not only in matters of statutory construction but also in those of decisional law.

. . . . . .

"This appreciation of the broader role played by legislation in the development of the law reflects the practices of common-law courts from the most ancient times. As Professor Landis has said, 'much of what is ordinarily regarded as "common law" finds its source in legislative enactment.' Landis, *supra*, at 214. *It has always been the duty of the common-law court to perceive the impact of major legislative innovations and to interweave the new legislative policies with the inherited body of common-law principles—* many of them deriving from earlier legislative exertions." Moragne v. States Marine Lines, *supra*, 398 U.S. at 390–392, 90 S.Ct. at 1782. (emphasis added)

The court recognized that every state has enacted a wrongful death statute and that several federal statutes similarly allowed actions for wrongful death. Thus, the court found the creation of a federal common law of wrongful death appropriate, although neither federal statute nor Florida state law had any such provisions.

We thus find no impediment to the creation of a federal common law of survival in civil rights actions in favor of the personal representative of the deceased. To the contrary, such a holding seems required by the policies underlying the civil rights laws and the Supreme Court's treatment of survival of actions in analogous contexts.[21]

20. Justice Blackmun did not participate in the decision.

21. We add a final note on the implication of the Court's holding upon 42 U.S.C. § 1988.

### III. Failure to State a Claim Under 42 U.S.C. §§ 1985, 1986

The text of 42 U.S.C. § 1985 is set out in footnote 2 of this opinion. Although plaintiff's amended complaint simply refers to the rather lengthy statute as a whole, the language upon which all parties rely is contained in the last clause of § 1985(2) and the first two clauses of § 1985(3). These portions of the statute, in essence, prohibit certain conspiracies with intent by the conspirators to deprive any person of the equal protection of the laws. In Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court, interpreting § 1985(3), unanimously held:

"It is thus evident that all indicators —text, companion provisions, and legislative history—point unwaveringly to § 1985(3)'s coverage of private conspiracies. That the statute was meant to reach private action does not, however, mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others. For, though the supporters of the legislation insisted on coverage of private conspiracies, they were equally emphatic that they did not believe, in the words of Representative Cook, 'that Congress has a right to punish an assault and battery when committed by two or more persons within a State.' *Id.*, at 485. The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment. See the remarks of Representatives Willard and Shella-

barger, quoted *supra,* at 100 [91 S.Ct. at 1797]. The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." (footnotes omitted) *Id.* at 101–02, 91 S.Ct. at 1798.

■ Thus, a complaint does not state a cause of action under § 1985(3) unless it alleges some racially, or perhaps otherwise class-based, discriminatory intent. There is no need for us to reach the question, expressly reserved by the Supreme Court, Griffin v. Breckenridge, *supra* at 102 n. 9, 91 S.Ct. 1790, whether an invidiously discriminatory intent other than racial bias would be sufficient to state a cause of action under the portions of § 1985(3) at issue here. *Cf.* Cong.Globe, 42d Cong., 1st Sess., 567 (1871) (remarks of Sen. Edmunds). Even assuming that any class-based discriminatory intent is actionable, there is not the slightest evidence of any such intent in the record. There is no evidence in any of the answers to interrogatories filed that Shaw was being prosecuted because he was a member of any identifiable group, cognizable by the equal protection clause or otherwise.

Although the Supreme Court in *Griffin* was construing only § 1985(3), there is no reason to believe that the result should be any different with reference to the last clause of § 1985(2). The language under § 1985(2) concerning intent to deprive persons of equal protection of the laws is substantially the same as that under § 1985(3), and

Nothing this Court holds today has any tendency to make § 1988 mere surplusage. We went beyond the dictates of § 1988 to create a federal common law of survival in this case because the federal policy in favor of this "remedy" is clear and the state laws, except for Louisiana's, overwhelmingly per-

mit personal representatives of the deceased to bring suit where the cause of action survived. We further found a developing federal common law of survival. Where this convergence of factors does not exist, a different result may be required.

should be read the same way. Johnston v. National Broadcasting Company, Inc., 356 F.Supp. 904 (E.D.N.Y.1973).

The only other portion of § 1985 possibly relevant to the facts of this case is the first clause of § 1985(2):

"If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness *in any court of the United States* from attending such court, *or from testifying to any matter pending therein, freely, fully, and truthfully,* as to injure such party or witness in his person or property on account of having so attended or testified, . . . the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators." (emphasis added)

Although none of the parties has specifically relied on this section, the Court has considered it in order to make a proper disposition of defendants' motion to dismiss. At first glance, the provision quoted above appears almost exactly to cover the conduct alleged in the complaint. Moreover, it appears from the construction of the statute that the requirement of intent to deprive persons of the equal protection of the laws may apply only to the second of the two clauses of § 1985(2). If this is so, lack of such discriminatory animus on the part of defendants would not be fatal to plaintiff's cause of action under clause 1.

■■■ However, we need not reach this question of whether the intent to deprive of equal protection is a requirement of both clauses. Upon a closer

reading of the provision it is clear that it prohibits, by its terms, only conspiracies to deter persons from testifying in "any court of the United States." As defined in 28 U.S.C. § 451, "court of the United States" refers only to the Article III courts and certain federal courts created by Act of Congress. It does not include the various state courts. This is fatal to plaintiff's claim, for it is only in a Louisiana state trial court that plaintiff was tried, and in which defendants allegedly conspired to deter witnesses from testifying truthfully.[22]

■■■ Thus the complaint does not state a cause of action under 42 U.S.C. § 1985. This conclusion disposes of the claim under § 1986 as well, for § 1986 is entirely derivative from § 1985. By its terms, the former statute has reference only to conspiracies cognizable under § 1985. Accordingly, the courts have recognized that if the conspiracy underlying a claim asserted under § 1986 fails to meet the requirements of § 1985, then the § 1986 claim also must fall. Dowsey v. Wilkins, 467 F.2d 1022, 1026 (5th Cir. 1972); Johnston v. National Broadcasting Co., Inc., *supra,* 356 F.Supp. at 909–10; Post v. Payton, 323 F.Supp. 799, 802 (E.D.N.Y.1971); Huey v. Barloga, 277 F.Supp. 864, 875 (N.D.Ill.1967).

The motions by defendants to dismiss for failure to state a claim upon which relief can be granted have been brought only with reference to §§ 1985 and 1986. We simply emphasize here that the Court's granting of these motions does not dismiss any of the defendants from the present suit. Plaintiff's complaint still properly alleges a cause of action against each of the defendants pursuant to 42 U.S.C. § 1983, which none of the defendants have challenged.

---

22. Although 28 U.S.C. § 451 was originally passed in 1948, "court of the United States" had the same meaning when Congress used the term in enacting the predecessor of 42 U.S.C. § 1985(2). The particular provision relating to conspiracies to deter witnesses from testifying truthfully was a little-discussed portion of the civil rights bill. But it is clear that the concern of Congress was solely to protect the integrity of the newly-created remedy in federal court. *See* Cong. Globe, 42d Cong., 1st Sess., p. 486 (remarks of Rep. Cook). Thus, Congress did not intend that portion of the statute to extend to any interference with the testimony of witnesses which occurred only in connection with state court proceedings.

■ Although that statute carries with it the requirement that the prohibited acts be committed under color of state law, it is now clear that private persons may be sued under the statute if they are acting in conspiracy with some state official. United States v. Price, 383 U.S. 787, 794, 86 S.Ct. 1152, 16 L. Ed.2d 267 (1966); Fulton v. Emerson Electric Co., 420 F.2d 527, 530 (5th Cir. 1969); Gomez v. Florida State Employment Service, 417 F.2d 569, 578–79 (5th Cir. 1969); Baldwin v. Morgan, 287 F. 2d 750 (5th Cir. 1961). The Supreme Court, construing 18 U.S.C. § 242, the criminal counterpart of 42 U.S.C. § 1983, stated:

"Section 242 applies only where a person indicted has acted 'under color' of law. Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents." (footnote omitted) United States v. Price, *supra*, 383 U.S. at 794, 86 S.Ct. at 1156.

The same result is required under § 1983, since "under color" of law has an identical meaning under both statutes. *Id.* at 794 n. 7, 86 S.Ct. 1152.

■ In the case at bar, plaintiff's complaint more than adequately alleges a conspiracy between the private defendants and Jim Garrison, who was acting under state law in his capacity as District Attorney of Orleans Parish. The details of these allegations are set out in Part I of the Court's opinion, and need not be repeated here. Plaintiff may or may not be able to prove such allegations at trial, but they are clearly sufficient to state a cause of action under § 1983 against each of the defendants.

For the reasons stated above,

It is the order of the Court that the motion on behalf of defendants, Joseph M. Rault, Jr., Cecil M. Shilstone, Willard E. Robertson, and Dr. Esmond A. Fat-ter, to dismiss for abatement of the action due to the death of plaintiff, Clay Shaw, be, and the same is hereby, denied.

It is the further order of the Court that the motion on behalf of defendants, Joseph M. Rault, Jr., Cecil M. Shilstone, Willard E. Robertson, and Dr. Esmond A. Fatter, to dismiss for failure to state a claim under 42 U.S.C. §§ 1985, 1986, upon which relief can be granted, be, and the same is hereby, granted.